## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **ANGELA RILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 1:15-cv-391-WTL-DML** |
| | ) | |
| **CITY OF KOKOMO, INDIANA** | ) | |
| **HOUSING AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is the Defendant's fully briefed Motion for Summary Judgment (Dkt. No. 59). The Court, being duly advised, now **GRANTS** the Defendant's motion for the reasons set forth below.

## I.      STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("[S]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show

what evidence it has that would convince a trier of fact to accept its version of events") (internal quotation omitted).  Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment."  *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001); *see also Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing.").

## II.  BACKGROUND

### A.  Plaintiffs' Factual Allegations

The Court notes at the outset that, in ruling on the Defendant's summary judgment motion, it has been hindered by the Plaintiff's muddled presentation in this case.  It has had to expend entirely too much of the Court's limited resources sorting through both facts and argument.  For example, many of the facts contained in the Plaintiff's Factual Background and Statement of Material Facts in Dispute section are not supported by the evidence of record to which the Plaintiff cites.  The facts that follow are those that are supported by the record and viewed in the light most favorable to the Plaintiff.  Additional facts are included in the Discussion section below.

#### 1.   *Riley's Employment with KHA*

In November 2008, Riley began working for Kokomo Housing Authority ("KHA") as a front desk clerk in KHA's Housing Choice Voucher Program ("HCVP"), which provides vouchers to low income individuals and families to subsidize rent in privately owned rental properties throughout Kokomo, Indiana.  She answered phones, greeted visitors to the office, sent out letters for appointments, and did filing.  Dkt. No.79-1 at 10.  When Riley began her employment with KHA, Shirley Young was the CEO, and Mariella Kelly was KHA's Director of

Human Resources.  Cheryl Morrow became the Director of Human Resources on October 15, 2011, and Debra Cook became CEO on April 30, 2012.

KHA also maintains a separate public housing program, renting units it owns to low income tenants.  During Riley's employment, the offices for this program were located in a different building from the HCVP offices.  *Id.*

### 2.    *Medical Conditions and Leave*

Between 2000 and 2003, Riley was diagnosed with bipolar disorder, generalized anxiety disorder, depression, post-traumatic stress disorder, and frontal lobe seizures.  She also experienced photosensitivity that could trigger seizures.  She first sought leave for seizures and severe anxiety in mid-March 2010.  Dkt. No. 65 at 13-16.  Her treating physician assistant certified that she would require periodic leave of one to eight hours of leave per day for up to two days per week.  *Id.* at 15.

From mid-March 2010 on, Riley continued to use intermittent leave.  She recertified her leave on five occasions.  *See id.* at 17-44.  In each instance, her treating physician assistant explained that her condition was "lifelong" and that "during excerbation [sic]," she was unable to "perform any work" or "function."  *Id.* at 14; 18; 22; 26; 31; and 42.  In addition, Riley took a block medical leave from September 18, 2013, through October 31, 2013, for frequent panic attacks.  *See id.* at 35-38.  In that leave certification, Riley's nurse explained that Riley was unable to perform essential job functions due to her condition, stating that she was "unable to interact well with others [at] this time."  *Id.* at 36.

### 3.    *Outside Incident with Public Housing Recipient*

On March 30, 2010, Riley and Nichole Tarrant, a public housing recipient, got into a physical altercation.  Tarrant was dating Riley's daughter's father, and Riley's daughter was at

Tarrant's home that day.  Riley went to Tarrant's home to pick up her daughter.  Her daughter came outside and told Riley that she did not want to leave.  Her daughter then went back inside Tarrant's house.  Tarrant closed and locked the screen door.  Riley punched through the screen and unlocked the door.  Tarrant then went outside, and the two women engaged in a physical altercation.  Riley was charged with battery and criminal mischief and pled guilty to criminal mischief.  She informed KHA of the incident.

### 4.  *Job Transfers*

In April 2010, Riley was transferred out of her HCVP front desk position.  She then split her time between the HCVP office and a new position in the public housing office.  Dkt. No. 79-1 at 14.  Her new position was titled community services clerk/low rent public housing clerk.[1]  Dkt. No. 79-1 at 14.  Carol Kindlesparker, another KHA employee, was transferred to the HCVP office to take over Riley's former duties.  When working in the HCVP location, Riley worked out of a small filing room/closet because Kindlesparker sat at the front desk location.

Effective December 1, 2010, Riley was promoted to the position of low rent application processing clerk in the public housing program.  *Id.*  She received a pay raise of nearly $4,000.00.  *Id.*  Her duties included processing applications for low rent public housing, interviewing applicants, maintaining a wait list and applicant files, and communicating with applicants when units became available.  *Id.* at 16; *see also* Dkt. No. 61 at 6.  She no longer

---

[1]  KHA asserts that Riley's new position as of April 26, 2010, was "Public Housing Services Clerk," and, on May 17, 2010, her title became "Low Rent Services Clerk/Leasing Specialist Trainee," and she no longer split her time between the two offices, instead working exclusively in the public housing office.  Dkt. No. 60-4 at 4-5.  Although Riley disputes the titles and asserts that no reasons were given for the transfers, she does not dispute the timing of the job changes.  *See* Dkt. No. 80 at 4-5.

worked in the small filing room/closet or had access to HCVP recipients' files.  She remained in this position until her termination on May 12, 2014.

### 5. Riley's Complaints Regarding Co-Workers

In May 2010, Riley complained to Young about a co-worker, Mary Sarra.  Dkt. No. 79-1 at 36.  She complained that Sarra made "belligerent comments," sent "sexual[-]in[-]nature forwards," smelled like alcohol and was sent home for a hangover, had her bills paid by another employee, and otherwise received "extreme preferential treatment."  *Id.*  Riley also made several complaints about another co-worker, Joe Milam.  *Id.* at 35.  In 2012, she complained that Milam "wears jeans any day (not just Friday's [sic]) and wears them so low that the crack of his bottom has been exposed multiple times . . . all the staff finds offensive to the point of it being a sexual harassment issue."  Dkt. No. 65 at 107; *see also* Dkt. No. 79-1 at 63 ("wearing his pants the way he does on a daily basis, that's sexual harassment, when I can see his bottom every single day").  In both 2012 and 2013, she complained that Milam made derogatory comments about public housing recipients, implying that "[they] deserve less because [they are] low income," Dkt. No. 79-1 at 69; *see also* Dkt. No. 65 at 107 ("When he is talking to us in our office[,] he uses very derogatory language, talks down about the clients and procedure of KHA.").  She also complained that "he believed that bedbugs were a behavioral issue," Dkt. No. 79-1 at 70, and that, in April 2014, he "made the comment that . . . mental illness and substance abuse goes [sic] hand in hand," Dkt. No. 79-1 at 69-70.  In addition, she complained that Milam ate breakfast on the clock and "is constantly on his cell phone with his wife, mother, day care centers for his child . . . handling personal business at work since his first day."  Dkt. No. 65 at 107.

Riley also complained more than once to Morrow that Tina Bellis, her direct supervisor, touched and kissed her.  She "let [Morrow] know that . . . [Bellis will] put her arm around you,

give you a kiss on the cheek.  She'll set her breast -- like walk up so close to you and just kind of

set her breasts on you."  Dkt. No. 79-1 at 71.  Riley explained that "[s]he didn't just do it to me,

she did it to other men in the office, the other ladies in the office, so it wasn't just me."  *Id.* at 72.

After they had sexual harassment training, Riley told Morrow that Bellis's behavior "was getting

to the point to where it was considered sexual harassment, as far as the handbook is concerned."

*Id.* at 71.  After that complaint, the behavior stopped.  *Id.*  Morrow investigated Riley's

complaints and issued a memorandum on December 31, 2012, explaining that she counseled

Bellis regarding the behavior.  *See* Dkt. No. 65 at 109.  Riley made several other complaints

about Bellis, including about how she had a "very offensive odor," "will scratch her private

area," and "is not aware of how to do the most simple of things in the office."  *Id.* at 107.

### 6. *Complaints about Riley from Co-Workers*

During Riley's employment, KHA received various complaints about Riley from her co-

workers.  Kindlesparker sent Morrow a memorandum on March 13, 2013, complaining about

Riley's tone, that she was "not friendly, very monotone and very hateful toward [her]" and

Bellis.  Dkt. No. 65 at 61.  Milam also complained about Riley.  Dkt. No. 79-1 at 35.  Cook did

not address these complaints with Riley.

Cook received reports from others complaining of Riley's negative attitude toward co-

workers.  Dkt. No. 60-1 at 5.  For example, she learned of the following interactions prior to

Riley's termination.  On March 13, 2014, Jay Byars, who had recently moved from maintenance

into administration, sent Riley an email asking Riley to explain the process for filling empty

rental units.  Dkt. No. 65 at 62-63.  Byars acknowledged that he was "still learning the whole

process," but thought that prospective tenants had 24 hours to respond that they were interested

in obtaining housing rather than 72 hours, as he believed Riley had told him when they had

spoken the week before.  *Id.* at 62.  Riley responded by explaining the process to him and

concluded her message saying, "if you don't believe someone is doing their job correctly then

say something."  *Id.*  Riley did not find her response to be disrespectful, but agreed that it was

defensive "to a certain extent maybe."  Dkt. No. 79-1 at 38.  She was offended because "[Byars]

was acting as though [she] didn't know how to do [her] job, but [he acted like] he knew what he

was doing.  He had just started."  *Id.* at 39.

Cook also learned that on April 16, 2014, Bellis sent an email to Riley explaining the

process for handling online pre-applications.  *See* Dkt. No. 60-1 at 5 (citing Dkt. No. 65 at 60).

It was in response to a conversation that they had had earlier with Kindlesparker.  The next day,

Riley responded that she understood what her responsibilities were and added, "[a]lthough I

don't understand where this random email came from and why you are speaking to me as if I am

unaware of my job."  Dkt. No. 65 at 60.  In response to Bellis's request that Riley note when she

gets no response from a housing applicant or when she learns that a telephone number is

disconnected, Riley stated "I am also competent enough to know to keep notes if a number is

disconnected or an email is invalid when trying to contact somebody."  *Id.*  In her deposition

Riley explained that she took a defensive tone in response to Bellis's email, but denied that she

was unprofessional.  Instead, she believed Bellis's email was unprofessional for the following

reason:

> She's talking about a situation she didn't know anything about.  She's talking about
> a conversation that she involved herself in.  And when I asked her for her opinion,
> she said that she didn't know anything about it.  Now all of a sudden she sends me
> an email all of an [sic] sudden knowing everything about it.

Dkt. No. 79-1 at 36.

On April 22, 2014, Kindlesparker complained to Morrow and Cook that Riley argued

with her and was upset about the pre-application process when Kindlesparker told her that people

who come into the office were to complete the online pre-application rather than filling out paper applications.  Dkt. No. 60-1 at 19.

### 7.    *Discipline*

On March 7, 2014, Riley received a written warning for insubordination and a policy violation.  *See* Dkt. No. 79-14.  The warning explained that Riley "arranged a [t]ransfer" of a tenant from one public housing unit to another without an approval of the tenant's transfer request or a completed move-out inspection.  *Id.*  On March 6, 2014, Riley scheduled an appointment for a current tenant, who happened to be her friend, to visit a unit.  Dkt. No. 79-1 at 41-42.  The same day, Riley sent an email to Margaret King, a KHA leasing specialist, providing the tenant's name and explaining, "There is no app[lication].  She would be transfer."  Dkt. No. 65 at 67.  King requested the tenant's file from Riley, and Riley stated that she would have the tenant's file sent to her.  *Id.*  From the information Riley provided to her, King assumed that the tenant was already approved for the transfer, *id.*, so she leased the property to the tenant, Dkt. No. 60-4 at 25.  Because the tenant had not been approved for the transfer, King received a verbal warning for leasing the property.  *See id.*

Riley does not dispute that she received a written warning for arranging the transfer.  She signed the disciplinary warning.  *See* Dkt. No. 79-14.  However, she argues that she was falsely blamed for the unapproved transfer.  Dkt. No. 80 at 7.  She did not have the authority to authorize a transfer.  *Id.*  Riley contends that her only involvement in the transfer process is to schedule appointments for prospective tenants to see units.  Dkt. No. 79-1 at 41-42.  The tenant's name was on her transfer list, so she scheduled an appointment.  *Id.* at 43.  The Court summarizes the normal process for a tenant seeking to transfer as follows: The tenant submits a written request to transfer.  That transfer request is then either approved or denied by Bellis or

Kearnes.  *See id.*  Approved tenants then have their names given to Riley so that she can call them to set up appointments for them to visit an available unit.  *Id.*  Riley stated that, "as far as [she] was aware," that process had occurred prior to her calling the tenant "[b]ecause she was on [Riley's] list."  *Id.*

### 8.      Incident Leading to Termination

On May 7, 2014, Riley learned that people were moving into a housing unit without completing the standard steps in the process.  She believed the move to be unauthorized, so she went to Kindlesparker's office and told both Kindlesparker and Bellis, who was in Kindlesparker's office at the time, about the situation.  Bellis relayed the information to Cook, and Bellis then told Riley that Cook knew about the move and described it as a special circumstance.  "Riley questioned Bellis' explanation because KHA did not have special circumstances."  Dkt. No. 80 at 8.  "[S]he was upset that the procedures were not being followed and only the Kokomo Police Department . . . and Cook knew who was moving into the unit."  *Id.*; *see also* Dkt. No. 79-1 at 51.

At that point, Riley called Cook to talk with her about the matter.  Cook told Riley that she was busy.  Riley, still upset, then called the Indianapolis HUD office.  *See* Dkt. No. 79-1 at 53 (responding to the question, "Do you acknowledge that on May 7th you became upset?," Riley answered: "When my CEO didn't follow directions, and she expects everyone else to, yes, that's when I called and reported her.").  She spoke with Nathanial Johnson, a HUD intake analyst.  "[She] told him that [she] wanted to report a fraudulent activity or something that [she] suspected was inappropriate."  *Id.* at 52.  "He told [her] that he would send the information to Forrest Jones, which was his boss . . . and that [she] should also take it up with the Civil Rights Department."  *Id.*

9

While discussing the situation with Cook, Bellis complained about Riley's behavior.  She explained that Riley was at that moment confrontational and disrespectful.  Dkt. No. 60-8 at 4.  After Cook learned this information, she instructed Kindlesparker to go to Riley's office.  Kindlesparker went to Riley's office and told her that Cook could see her.  Instead of going to Cook's office, Riley called Cook and told her that she had already reported the incident to HUD's Indianapolis office and that she did not need to speak with Cook.[2]  Cook did not tell Riley to come to her office during their conversation, but she told Riley that whenever she complained to the HUD office, "it cost them money."  Dkt. No. 79-1 at 52.

That same day, Cook sent an email to Morrow telling her that "Riley is going to be suspended for insubordination."  Dkt. No. 79-19 at 1.  After Cook sent the email to Morrow, she created a termination notice.  Dkt. No. 80 at 9; *see also* Dkt. No. 60-1 at 21 (containing metadata indicating that the termination document was created thirty minutes after Cook's email to Morrow).  The document was modified the following afternoon, and Cook signed it on Friday, May 9, 2014.

Riley was absent from work on Thursday, May 8, 2014, and Friday, May 9, 2014.  She took an FMLA day on Thursday and used a vacation day on Friday.  *See* Dkt. No. 79-1 at 60 (Riley explaining that she understood she was allowed only two days of medical leave per week according to her leave certification and that she had already used one day earlier that week, so she knew she had to use a vacation day for Friday, May 9, 2014).  Bellis and Morrow presented Riley with the termination notice on Monday, May 12, 2014, when she returned to work.  The termination notice indicated that Riley was terminated for "Lack of Cooperation/Teamwork,"

---

[2]  KHA disputes that Riley told Cook that she called HUD's Indianapolis office.  *See* Dkt. No. 61 at 32.  For purposes of this Entry, the Court accepts as true that Cook knew that Riley called HUD on May 7, 2014.

"Violation of KHA Rules of Conduct," "Insubordination," and "Improper Conduct."  Dkt. No. 79-20 at 1.

## B.     The Lawsuit

On March 6, 2015, Riley, along with two additional plaintiffs, filed suit in this Court, seeking legal and injunctive relief for various federal law violations.[3]  Riley asserts several claims, including:

- Discrimination, retaliation, and failure to accommodate claims under the Americans with Disabilities Act ("ADA");

- Retaliation under Title VII of the Civil Rights Act;

- FMLA interference and retaliation claims;

- Retaliation under the Fair Housing Act ("FHA");

- Claims pursuant to 42 U.S.C. § 1981 in relation to her FHA, ADA, and Title VII claims; and

- Claims pursuant to 42 U.S.C. §§ 1983 and 1985 with respect to her FHA discrimination and retaliation claims.

*See* Dkt. No. 1 at 9-11.

In response to the Defendant's motion for summary judgment, Riley clarifies that she does not assert sex or race discrimination claims or a hostile work environment claim under Title VII and that she will not pursue any claims under 42 U.S.C. §§ 1981, 1983, or 1985.  *See* Dkt. No. 80 at 25-26 and 34, respectively.

---

[3]  Two additional plaintiffs in this case, Kathryn Knight and Jodonna Brown, were dismissed following the parties' submission of joint motions to dismiss their claims.  *See* Dkt. Nos. 43 & 56, respectively.

## III.   <u>DISCUSSION</u>

The Defendant moves for summary judgment as to all of Riley's remaining claims.  Each claim is addressed, in turn, below.

### A.   ADA Claims

The Court understands Riley to allege three separate claims under the ADA: a failure to accommodate claim, a disparate treatment claim, and a retaliation claim for opposing disability discrimination.

#### 1.   *Failure to Accommodate Claim*

KHA maintains that summary judgment is appropriate with respect to Riley's failure to accommodate claim because she did not exhaust her administrative remedies with respect to this claim.  Dkt. No. 61 at 21.

Before bringing a lawsuit alleging violations of the ADA, a plaintiff must file a charge of discrimination with the EEOC.  42 U.S.C. § 2000e-5.  Claims that are not raised in an EEOC charge may only be brought in a lawsuit if they are "'[1] reasonably related to one of the EEOC charges and [2] can be expected to develop from an investigation into the charges actually raised.'"  *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 812 (7th Cir. 2014) (quoting *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999)).  "[T]he EEOC charge and the complaint must, at a minimum, 'describe the *same conduct* and implicate the *same individuals*'" for claims to be reasonably related to one another.  *Whitaker*, 772 F.3d at 812-13 (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994) (emphasis in original)).  Whether Riley's failure to accommodate claim is within the scope of her EEOC charge is a question of law.  *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 2557 (7th Cir. 2011) (analyzing

12

claims under Title VII) (citing *Conner v. Ill. Dep't of Nat. Res.*, 413 F.3d 675, 680 (7th Cir. 2005)).

Riley did not assert a failure to accommodate claim in her EEOC charge or include in her charge any facts supporting such a claim.  Riley's complaint also omitted any facts supporting a failure to accommodate claim, even though she asserted there that KHA failed to accommodate her.  Riley first asserted specific instances of KHA's failure to provide reasonable accommodation in her response in opposition to KHA's motion for summary judgment.  There, Riley asserted that she was not granted additional medical leave following the May 7, 2014, incident; was denied a request to not be left alone while at work; was initially denied an accommodation, which she received three months later, for light sensitivity; and was not provided "the accommodation of talking to [her] about any problem on May 12 [her termination date] when she was not as upset, stressed and anxious."  Dkt. No. 80 at 25.

Riley does not respond to KHA's arguments; nor does she argue that her failure to accommodate claim is reasonably related to any claim brought in her EEOC charge or expected to develop from an investigation into the claims raised in her charge.  Even if she had, it is clear from the filings in this case that the conduct alleged in Riley's EEOC charge does not describe the same conduct she first raises in her response to KHA's motion for summary judgment.[4]

Riley's failure to accommodate claim is barred because she failed to exhaust her administrative remedy with respect to that claim, and the claims brought in her EEOC charge are not reasonably related to a failure to accommodate claim.  Moreover, the Seventh Circuit has said that "one cannot expect a failure to accommodate claim to develop from an investigation

---

[4]  Although Riley implicates two individuals, Morrow and Cook, in both her EEOC charge and her brief, that commonality is insufficient to link her failure to accommodate claim to the factually distinct claims asserted in her EEOC charge.

into a claim that an employee was terminated because of a disability [or similarly, unlawful retaliation]." *Green*, 197 F.3d at 898.  Accordingly, the Court **GRANTS** summary judgment in favor of KHA with respect to Riley's failure to accommodate claim.

## 2.    *Discrimination Claim*

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability . . . ."  42 U.S.C. § 12112(a).  Riley appears to claim that she was discriminated against because of a disability.  Riley, however, has not developed her claim.  The fundamental inquiry at the summary judgment stage is, "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?"  *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (citing *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) ("The central question at issue is whether the employer acted on account of the plaintiff's . . . disability . . . .")).  In other words, the test "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [disability] caused the discharge or other adverse employment action."  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  While Riley lists a number of actions that she considers adverse, she has not pointed the Court to evidence that would permit a reasonable factfinder to conclude that her disability caused the adverse actions; nor has she even attempted to articulate why she believes that KHA took any actions on account of her disability.  "'[A] district court is not required to scour the record looking for factual disputes [or] to scour the party's various submissions to piece together appropriate arguments.  A court need not make the lawyer's case.'"  *Diadenko v. Folino*, 741 F.3d 751, 757 (7th Cir. 2013) (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (internal citation omitted)).  Of aid to the Court would have been a cogent, well-organized argument properly supported by record evidence and legal authority that

14

responded to the issues raised by KHA.  Without developed arguments and evidence to support it, Riley's discrimination claim fails, and the Court **GRANTS** summary judgment in favor of KHA on this claim.

### B.      Retaliation Claims

Riley asserts that KHA retaliated against her for opposing race, sex, and disability discrimination.  Compl. ¶¶ 87; 91.  She claims that she was retaliated against for exercising her rights under Title VII, the FMLA, and the FHA.  Title VII and the ADA "forbid[] employer actions that 'discriminate against' an employee . . . because he has 'opposed' a practice that Title VII [or the ADA] forbids or has 'made a charge, testified, assisted, or participated in' a Title VII [or ADA] 'investigation, proceeding, or hearing.'"  *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a), discussing Title VII); *see also* 42 U.S.C. § 12203 (same related to acts or practices made unlawful by the ADA).  The FHA protects individuals from retaliation as well.  *See* 42 U.S.C. § 3617 ("It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of [the FHA].").  The Court will address each of Riley's claims below.

### 1.      Title VII and ADA Retaliation Claims

In a section entitled, "Riley's Title VII and ADA Retaliation Claims Fail As A Matter of Law," KHA makes the following arguments:

- None of the conduct Riley challenges, except for her termination, constitutes a materially adverse action;

- Most of Riley's complaints to KHA are not protected activities under Title VII or the ADA because she was not opposing unlawful discrimination;

- Riley offers no evidence to establish any protected activity was the "but for" cause of her termination or any other alleged adverse action;

- Riley does not provide any evidence demonstrating a causal connection between her alleged Title VII or ADA protected activities and any adverse employment action;

- Temporal proximity between any protected activity and adverse action is insufficient to establish a causal connection;

- Riley fails to show that she was treated differently from a similarly situated comparator who did not complain of discrimination; and

- Riley fails to show that KHA's actions were pretextual.

*See* Dkt. No. 61 at 23-27.

Riley makes no coherent argument responding to KHA's contentions. Most importantly, she has not demonstrated that there is any evidence to support a causal connection between her complaints to KHA and any adverse action. The entirety of Riley's response to KHA's arguments on these issues is as follows:

### Riley's Title VII And ADA Retaliation Claims Do Not Fail As A Matter of Law.

KHA does not dispute that the termination was an adverse action. Dkt. [No.] 61 at 24:10 [sic]. KHA recognizes that Riley was in a fragile mental state "with [sic] several mental disorders and took extensive medical leave at the Housing Authority." Dkt. [No.] 61 at 1. "The Housing Authority also regularly drove Riley home when she requested a ride after [sic] a seizure." Dkt. [No.] 61 at 15:9-10. KHA delayed accommodations and lied to her and told her that she had exhausted her FMLA leave. Dkt. [No.] 61 at 22:3 [sic]; Dkt. [No.] 79-1 at 24-25 (Riley Dep. 95:20-98:5); Dkt. [No.] 79-7. KHA knew of Riley's particular vulnerability because of mental disorders that increased her stress and anxiety. KHA did not provide accommodations of granting her ADA leave, not stressing her when she was already stressed, not trying to dissuade her from complaining,

calling her if there was any problem, and talking to her about any problem when she returned to work after having two seizure episodes. KHA's actions would have more of an effect on a mentally fragile person like Riley with a vulnerability even before KHA terminated her. *Washington*, 420 F.3d at 661-662 [sic].

The actions of KHA of threatening to evict Riley from her housing might also dissuade a reasonable person from complaining. *Burlington Northern, supra.* In fact, a lesser threat made verbally by the CEO to Knight did dissuade her from complaining, and she withdrew her complaint of discrimination from HUD. Dkt. [No.] 79-2 at 9-10 (Knight Dep. 34:16-39:18).

With regard to Riley, KHA's threats and actions to try to evict her were even more dissuading, because KHA had already falsely accused her of insubordination twice, terminated her employment, made it difficult for her to find work in Kokomo, and caused her to have to go to Indianapolis to find part-time work and leave her KHA housing.

KHA also cites *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 902 (7th Cir. 2003) as requiring tangible job consequences, but that was before *Burlington Northern, supra.* Furthermore, Riley had already suffered the consequences of having to be admitted to the hospital because of the stress and being terminated about a week after she returned to work from the hospital.

KHA argues that sexual desire is required for a complaint of sexual harassment, but of course, that is not true. *Oncale v. Sundowner Offshore Servs., Inc.* [sic] 523 U.S. 75, 80 (1998). Sexually offensive acts such as exposing body parts, rubbing body parts, and stereotyping persons is [sic] just as unlawful.

KHA implies that direct evidence is required for the direct method, which of course, is not true either, as explained again in the *Ortiz* decision.

KHA argues a "but for" standard for retaliation, but it has been clarified that the "but for" standard is the usual standard for most cases of a straw that broke the camel's back. *Burrage v. U.S.*, 571 U.S. __, __, 134 S.Ct. 881, 888 (2014); Seventh Circuit Pattern Civil Jury Instruction 3.02. Riley's case is not the rare mixed-motives case in which a lesser standard applies.

KHA argues the evidence from 2011 and 2012, but ignores the evidence from 2014.

KHA argues that Riley was not treated differently from other employees, but that is not true. Riley was treated differently from [the co-worker who received an oral warning] and all of the other employees who arranged the transfer of [the tenant in March 2014]. Riley was treated differently from all other employees who used white out to correct dates. Riley was treated differently after she corrected the date of Brown's application than she was before 2014 when she requested ADA

accommodation leave and other accommodations such as not being required to work alone, calling her if there was a problem, and not increasing her stress and anxiety.[5]

KHA makes a cursory statement that KHA's reasons were not pretexual, but KHA engaged in a long series of actions that are evidence of the pretext of its actions, as described in detail earlier.

Dkt. No. 80 at 26-28.

This falls far short of the type of cogent argument this Court is entitled to expect from counsel.  It is possible that Riley's counsel believes that statements scattered throughout his response brief might support Riley's retaliation claims, and perhaps, were they presented in an orderly manner, they might.  However, the adage that "Judges are not like pigs, hunting for truffles buried in briefs" applies here.  *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).  The Court will not make a party's arguments for her, nor will it assemble the evidence necessary to support her position.  *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) ("[W]e will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him."); *Herman*, 870 F.2d at 404 ("A district court need not scour the record to make the case of a party who does nothing.").  Courts are entitled to assistance from counsel:  "An advocate's job is to make it easy for the court to rule in his client's favor."  *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006).  When counsel instead presents the Court with a rat's nest, the Court refuses to dismantle it, as doing so would impose an extraordinary burden on the Court's limited resources.  As a result, the Court **GRANTS** summary judgment in KHA's favor with respect to Riley's Title VII and ADA retaliation claims.

---

[5] Here, Riley refers to an argument KHA makes regarding after-acquired evidence that it believes would limit potential damages in this case.  The Court has not included in this Entry the facts that support that argument because they are not relevant to the motion at issue.

## 2.    *FHA Retaliation Claim*

Riley asserts that "[t]he Defendant intentionally, with malice, and with deliberate indifference, conspired and discriminated in making unavailable and denying full use of a dwelling and in the provision of employment and services to Angela Riley because she had complained about disability, race and sex discrimination and was associated with, aided and assisted, and was a witness for other residents in exercising their rights in opposing discrimination."[6] Compl. ¶ 93.  The FHA makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605 or 3606 of [the FHA]." 42 U.S.C. § 3617.  Retaliation claims brought pursuant to FHA are similar to retaliation claims brought under Title VII.  *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 295 (7th Cir. 2000) ("provisions of [FHA and Title VII] are given like construction and application").

KHA argues that Riley's FHA retaliation claim fails because she did not engage in protected activity under the FHA when she complained to HUD; the retaliatory acts that she alleges, other than her termination, do not constitute adverse actions under the FHA; and she cannot prove a causal connection between any protected activity and an adverse action.  Dkt. No. 61 at 30-32.

---

[6]  While this complaint allegation potentially conflates various causes of action under the FHA, Riley refers only to "FHA Retaliation" in her briefing and develops no arguments regarding any other possible claim under the FHA.  *See, e.g.*, Dkt. No. 80 at 33.  As such, the Court examines this claim only.

KHA contends that Riley's complaint to HUD was not protected activity because she did not protest or oppose discrimination prohibited by the FHA.[7]  Riley's FHA retaliation claim stems from a complaint she made to HUD's Indianapolis office on May 7, 2014.  As previously stated, Riley learned that people were moving into a housing unit without completing the standard steps in the process.  She believed the move to be unauthorized, so she went to Kindlesparker's office and told both Kindlesparker and Bellis about the situation.  Bellis relayed the information to Cook, and Bellis then told Riley that Cook knew about the move and described it as a special circumstance.  "Riley questioned Bellis' explanation because KHA did not have special circumstances."  Dkt. No. 80 at 8.  "[S]he was upset that the procedures were not being followed and only the Kokomo Police Department . . . and Cook knew who was moving into the unit."  Dkt. No. 80 at 8; *see also* Dkt. No. 79-1 at 51.

At that point, Riley called Cook to talk with her about the matter.  Cook told Riley that she was busy.  Riley, still upset, then called the Indianapolis HUD office.  *See* Dkt. No. 79-1 at 53 (In response to being asked, "Do you acknowledge that on May 7th you became upset?," Riley answered: "When my CEO didn't follow directions, and she expects everyone else to, yes, that's when I called and reported her.").  She spoke with Nathanial Johnson, a HUD intake analyst.  "[She] told him that [she] wanted to report a fraudulent activity or something that [she] suspected was inappropriate."  Dkt. No. 79-1 at 52.  "He told [her] that he would send the information to Forrest Jones, which was his boss . . . and that [she] should also take it up with the Civil Rights Department."  *Id.*

---

[7]  KHA also contends that Cook did not know that Riley made a complaint to HUD on May 7, 2014.  Dkt. No. 61 at 32 ("Riley claims she told Cook that she did not need to meet with her because she had already called 'Indianapolis,' but Riley said nothing about calling HUD - let alone discuss the content of her call to 'Indianapolis.'").  As previously indicated, for purposes of this Entry, the Court accepts as true that Cook knew that Riley called HUD on May 7, 2014.

In Riley's surreply, she contends that, in her May 7, 2014, call to HUD, she "was complaining about the different treatment of her being disciplined for allegedly transferring someone without proper paperwork compared to other employees who were not being disciplined for placing tenants in a unit without any paperwork at all." Dkt. No. 89 at 15. She further contends that she "complained that putting unknown persons in housing ahead of others was discrimination." *Id.* These contentions are not supported by the record evidence. The record evidence supports KHA's contention: Riley stated in her deposition testimony that, when she called the intake analyst at HUD's Indianapolis office on May 7, 2014, referring to KHA allowing the occupancy of a unit without the completion of the normal paperwork, "[she] told him that [she] wanted to report a fraudulent activity or something that [she] suspected was inappropriate." Dkt. No. 79-1 at 52. "He told [her] that he would send the information to Forrest Jones, which was his boss . . . and that [she] should also take it up with the Civil Rights Department." *Id.* Although Riley's deposition testimony mentions "the Civil Rights Department," she does not describe that she complained about discrimination or referred to any protected class that was suffering unlawful discrimination under the FHA. With this particular complaint, Riley did not engage in protected activity. Accordingly, it cannot form the basis of a retaliation claim under the FHA.

In her briefings, Riley does not develop an argument regarding any other potentially protected activity under the FHA that might form the basis of her FHA retaliation claim. Instead, in her response brief, as in her surreply, she focuses on the May 7, 2014, complaint to HUD. As KHA correctly points out, Riley's explanation of her complaint to HUD describes a complaint related to her employment with KHA, not a complaint protected by the FHA. The entirety of her response to KHA's FHA retaliation arguments is as follows:

**Riley's FHA Retaliation Claims Do Not Fail As A Matter of Law.**

KHA argues that Riley's call to HUD was not protected activity, but it was part of a long series of complaints of discrimination by Riley, including complaints of discrimination based on sex, race, disability, FMLA, and retaliation.  KHA knew that when Riley complained, it was about the different treatment of other employees who moved in a tenant without proper paperwork approval when she had just two months earlier been given a written reprimand for the same thing and she was not even guilty of it.  When Riley gave the information to HUD, HUD told her to call the Civil Rights Department. Dkt. [No.] 79-1 at 52 (Riley Dep. 206:1-2, 207:1). Riley's termination was the culmination of all of her acts of opposing discrimination and requesting FMLA.

KHA admits that the termination was an adverse action.  KHA argues that all of the acts of interference were not serious, but the combination of delayed maintenance, multiple notices of eviction, telling Riley's primary witness Knight to especially not go on Riley's premises, and KHA's attempts to have Riley arrested on false charges caused Riley to not have housing rights and to have to move to Indianapolis.  KHA cites decisions that do not involve the extensive prior complaints of discrimination that Riley made and the particular fragile vulnerability that Riley was in at the time.  KHA does not argue that the actions against Riley might not dissuade a person from complaining about discrimination.  *Burlington Northern, supra.*

KHA argues that Cook did not know that Riley called HUD, but that is disputed and contrary to the evidence.  First, the whole KHA office knew that Riley was complaining to HUD.  Employees in the office heard Riley call the Indianapolis HUD office and complain about the different treatment she received. Dkt. [No.] 79-1 at 54 (Riley Dep. 213:5-21).[8][  ]KHA even admits that Riley told Cook that

---

[8]  The cited deposition testimony does not support Riley's contention that "[e]mployees in the office heard Riley complain [to HUD] about the different treatment she received."  The full deposition testimony cited follows here:

Q:      Okay.  Do you believe that anyone overheard you talking with Mr. Johnson at HUD?

A:      Yes.  My door was open.  I wasn't trying to hide that.

Q:      Do you have any evidence, anything that you would point to, to say it shows that [Kindlesparker] or [Bellis] knew you were talking to HUD?

A:      Of course they knew.  I had just got off the phone with Margaret and let her know that I had just called HUD.  They whole office knew that I was speaking to HUD, all of them.  They knew I was going to report it.  If she didn't speak to me, and nobody could explain to me what was going on, I was reporting it to the Indianapolis office.  I didn't keep it a secret.  I wasn't trying to be secretive in any way, shape or form.

> she had already complained to the Indianapolis office and they were handling the
> matter.  No one claims that they did not know what the Indianapolis office was.
> Riley had complained about discrimination for years, and she was complaining that
> other employees were allowed to move in persons without proper paperwork but
> she had been treated differently and had been given a written reprimand for
> insubordination for supposedly doing the same thing and she was not even guilty
> of it.

Dkt. No. 80 at 33-34.  Nothing in this argument changes the fact that, while Riley may have

believed she was being treated differently from other employees, her complaint to HUD did not

mention any discrimination based on any protected class or involve any right granted or

protected by the FHA.  *See* 42 U.S.C. § 3617.

Any other arguments that could potentially support her FHA retaliation claim remain

entirely undeveloped.  Again, the Court need not construct arguments for the parties.  *Economy

Folding Box Corp.*, 515 F.3d at 721; *see also Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 720 (7th

Cir. 2012) (plaintiff employee waived claim on appeal because she "did not meaningfully

develop an argument" at the district court level).  Because Riley has not shown that she engaged

in activity protected under the FHA, and because she does not develop any other arguments

supporting a claim for retaliation under the FHA, she has not met her burden, and the Court

**GRANTS** summary judgment in favor of KHA on Riley's FHA retaliation claim.

### C.    FMLA Claims

Riley asserts that she did not receive FMLA leave to which she was entitled and also that

she was retaliated against in violation of the FMLA.  An employer may not interfere with an

eligible employee's rights under the FMLA or discriminate against an eligible employee who

needs FMLA leave.  29 U.S.C. § 2615.  The statute also prohibits employers from retaliating

against an eligible employee for opposing any practice made unlawful by the FMLA.  *Id.*

---

Dkt. No. 79-1 at 54 (Riley Dep. 213:5-21).

KHA argues that Riley was not an "eligible employee" as defined by the FMLA because KHA did not employ fifty or more employees.  If Riley was not an eligible employee within the meaning of the statute, she would not have been entitled to the statute's benefits and protections. The statute, Code of Federal Regulations, and the Seventh Circuit recognize that, for the FMLA to apply, public agency employers, including KHA, must employ fifty or more employees within 75 miles of the employee's worksite.  The Seventh Circuit has succinctly described the requirement as follows:

> The FMLA generally applies only to employers with 50 or more employees, but the statute treats public agencies differently.  The FMLA specifies that public agencies are "employers" under the statute regardless of the number of employees. 29 U.S.C. § 2611(4)(A)(3); 29 C.F.R. § 825.108(d).  That numerical limitation, however, is resurrected elsewhere in the FMLA, which limits eligibility for FMLA protections to "eligible employees." 29 U.S.C. § 2611(2)(B)(ii).  The term "eligible employee" in the FMLA excludes "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." 29 U.S.C. § 2611(2)(B).  The regulations make clear that this provision applies to public agencies, stating "employees of public agencies must meet all of the requirements of eligibility, including the requirement that the employer . . . employed 50 employees at the worksite or within 75 miles." 29 C.F.R. § 825.108(d).  Therefore, even though public agencies fall within the FMLA regardless of the number of employees, those employees cannot seek FMLA benefits unless the agency employed at least 50 employees within a 75 mile area.

*Fain v. Wayne Cty. Auditor's Office*, 388 F.3d 257, 259 (7th Cir. 2004).

The fifty employee threshold "to ascertain an employee's eligibility for FMLA benefits is determined when the employee gives notice of the need for leave." 29 C.F.R. § 825.110(e). "[T]he employee's eligibility is not affected by any subsequent change in the number of employees employed at or within 75 miles of the employee's worksite, for that specific notice of the need for leave." *Id.*

Riley sought leave in mid-March 2010.  At that time, KHA had 42 employees.  *See* Dkt. No. 86-1 at 10-13.  Moreover, Morrow and Cook both declared that "[KHA] did not employ 50

or more employees at any time from March 18, 2010 to May 12, 2014," the time spanning from

Riley's initial FMLA certification to her termination date.[9] *See* Dkt. Nos. 60-4 at 4 & 86-1 at 3.

In opposition to KHA's evidence, Riley states that "KHA told employees that they were covered

by the FMLA" and that "Riley testified that KHA had to have had more than fifty employees

based on Riley's personal observation of KHA's actions." Dkt. No. 80 at 28 & 29 (citing Dkt.

No. 79-1 at 17). These statements, however, misconstrue Riley's testimony. The cited

deposition testimony follows:

> Q     All right. Do you know how many employees [KHA] employed when you
>        were terminated, like how many other employees there were?
> A     There would at least have to be 50 for me to receive FMLA, so I'm going
>        to have to say at least 50, but no I don't know an exact count.
> Q     Is that an assumption? I mean, do you know for certain that they had 50
>        employees?
> A     For a company to be eligible for FMLA, I believe they have to at least have
>        50 employees to even, for me to even apply for FMLA. So yeah, they would
>        have to have had at least 50 employees.
> Q     But do you know other than --
> A     Other than just going off law, no, I don't know that.
> Q     Okay. So is it fair to say that you have never -- you didn't have access to
>        payroll records when you were working at [KHA]. Correct?
> A     No, sir.
> Q     And you didn't have access to other records that would identify how many
>        employees [KHA] employed. Correct?
> A     An employee roster, yes -- usually just if they were in an office, and I would
>        need to contact somebody in an office. There still was an employee roster
>        for maintenance men and trash men and things like that, but, of course, with
>        the many different buildings, half of them we never even met. You know,

---

[9]  With its brief in support of its summary judgment motion, KHA provided only
Morrow's declaration above. In Riley's response to KHA's motion, she objects, stating that
"KHA still provides no payroll records on which anyone could make such a conclusory
statement about the records." Dkt. No. 80 at 29. She further argues that "the failure of KHA to
produce relevant evidence in its possession raises the inference that the evidence is not favorable
to KHA." *Id.* at 30. In response to Riley's objection, with its reply brief, KHA provided Cook's
declaration and payroll records evidencing KHA's employee headcount. Cook indicated that the
payroll records were produced to Riley on April 21, 2016. Dkt. No. 86-1 at 3. In her surreply,
Riley does not renew her objection in light of KHA's response, nor does she provide any
evidence contradicting KHA's assertions.

> some of the ones that worked in Pine Valley, we would see them maybe
> once a year, because there was no reason for them to come to our building.
>
> Q      Okay.   And so I assume, though, you never counted the number of
> employees.
>
> A      No, sir.

Dkt. No. 79-1 at 17.

Riley's testimony does not contradict KHA's evidence that it had fewer than fifty employees.  Consequently, Riley has not shown a material factual dispute regarding the number of individuals employed by KHA.  KHA has presented evidence that it did not have the requisite number of employees to trigger the FMLA.  Accordingly, Riley was not an "eligible employee" under the FMLA.

In response to KHA's argument, Riley mentions promissory estoppel.  Once more, however, she has failed to develop her argument.  "It is the parties' responsibility to allege facts and 'indicate their relevance under the correct legal standard.'" *Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) (quoting *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002)).  Riley presented no legal standard at all in her briefing, and although she referred to *Peters v. Gilead Sciences, Inc.*, 533 F.3d 594 (7th Cir. 2008), a case in which the plaintiff alleged that the employee handbook provided a basis for a promissory estoppel claim, Riley does not make a similar argument. Again, "[i]t is not the [C]ourt's responsibility to research the law and construct the parties' arguments for them." *Economy Folding Box Corp.*, 515 F. 3d at 721.

Assuming that Riley's claim were similar to the claim in *Peters*, and were based on her reliance on KHA's handbook, such a claim would fail.  KHA's employee handbook could not create a binding contract because it contained broad disclaimers in both the handbook text itself and in a separate employee acknowledgment, which Riley signed in 2008 and again in 2013,

stating that the employee handbook did not create a binding contract, express or implied.  *See* Dkt. No. 89-1 at 3 (disclaimer); Dkt No. 60-2 at 95 & 99 (acknowledgments).  The disclaimers foreclose any possibility that Riley could have reasonably relied upon the handbook to create a promise, and the Seventh Circuit has determined that, under Indiana law, such disclaimers are effective against claims of both breach of contract and promissory estoppel.  *Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1000 (7th Cir. 2000) ("Such a disclaimer, if clear and forthright, as it is here . . . is a complete defense to a suit for breach of contract based on an employee handbook.") (internal citation omitted).  Thus, any promissory estoppel claim that Riley could have developed would have nonetheless failed to survive summary judgment.

Riley also suggests that KHA should be equitably estopped from asserting the defense that Riley was not an "eligible employee" under the FMLA.  *See* Dkt. No. 89 at 16.  She asserts that "even if KHA had produced payroll records during discovery to substantiate a defense that Riley was not covered by FMLA, KHA would be estopped from making such a claim because it told her the opposite during her employment."  Dkt. No. 80 at 30.  It is Riley's burden to establish equitable estoppel applies in this case.  *Edgewater Hosp., Inc. v. Bowen*, 857 F.2d 1123, 1138 (7th Cir. 1988).  Unfortunately, she has, yet again, failed to develop her argument.  For a second time, she altogether neglects to present a legal standard, let alone apply that standard to the facts in this case.  Although she cites to a number of cases in her response brief, not a single case addresses an equitable estoppel claim.  *See* Dkt. No. 80 at 30.  In her surreply, she cites to three district court cases from other states, two in which the courts deny motions to dismiss FMLA claims because the plaintiffs raised equitable estoppel arguments, and one in which the court granted summary judgment to an employer on an FMLA claim after analyzing the plaintiff's well-developed equitable estoppel argument.  *See* Dkt. No. 89 at 16.  Riley does not

rely on these cases to support any argument other than to show that courts "have recognized that the doctrine of equitable estoppel applies in FMLA claims." *Id.* As has been stated many times before in this Entry, this Court need not construct arguments for the parties. *Economy Folding Box Corp.*, 515 F.3d at 721; *see also Puffer*, 675 F.3d at 720. A party cannot simply throw out a legal theory and expect the Court to do the work of determining how it applies in the case at hand. Because Riley does not develop her equitable estoppel argument, she has not met her burden, and the Court does not address the argument further. Accordingly, summary judgment is **GRANTED** in KHA's favor with regard to Riley's FMLA claims.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Dkt. No. 59) is **GRANTED** in its entirety.

SO ORDERED: 3/7/17

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification